IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:06-CR-47 |
| | ) | (JARVIS/GUYTON) |
| DANNY RAY COWARD, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This case is before the Court on Defendant's Motion to Suppress Evidence [Doc. 10]. This motion was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636(b). An evidentiary hearing was held on July 7, 2006. Assistant United States Attorney Tracy Stone was present representing the government. Assistant Federal Defender Paula Voss was present representing Defendant, Danny Ray Coward. Defendant was also present.

Defendant, Danny Ray Coward ("Coward") has been indicted [Doc. 1] on a three-count indictment, alleging as follows: Count One charges Defendant with being a felon in possession of firearms [specifically, three hand guns] on November 2, 2005. Count Two charges Defendant with possession of five (5) grams or more of crack cocaine on November 2, 2005, with intent to distribute. Count Three charges that on November 2, 2005, Defendant possessed firearms in furtherance of a drug trafficking crime, specifically, the above alleged possession of crack cocaine, with intent to distribute. These charges arise from the November 2, 2005 search of an apartment leased by Defendant's wife, Denise Coward ("Mrs. Coward"). During the search, Defendant was

1

found, along with firearms and narcotics.

Defendant has moved to suppress [Doc. 10] all items of evidence from the November 2, 2005 search, as well as any statements he gave, alleging that:

> (1) The warrantless search on November 2, 2005, was made without Denise Coward's consent or, alternatively, exceeded the scope of her consent, and

> (2) Defendant's statements must be suppressed as the fruit of an illegal search.

More specifically, Defendant states that on November 2, 2005, a uniformed officer of the Knoxville Police Department came to his family's apartment and told Mrs. Coward that he was doing a "knock and talk." The officer said he wanted to talk to her about possible drug activities involving young men who congregated around her yard and porch. Defendant contends that Mrs. Coward agreed to talk, but told the officers to wait at the door until she had secured her child, who had climbed up the inside stairs. Defendant states that the officer then entered the house without an invitation to do so and followed her upstairs; a second officer also entered the house at this time. Defendant contends that Mrs. Coward was ordered to go back downstairs and a full search of the residence, including "the insides of dressers, closets and closed containers," was conducted without a warrant. Pursuant to the search, Defendant [discovered hiding in the upstairs bedroom] was arrested and various items of contraband and several weapons and ammunition were seized.

Defendant contends that Mrs. Coward did not knowingly or willingly consent to the warrantless search of the family's apartment before the search was conducted. He further states that a FBI "Consent to Search" form was presented to Mrs. Coward after the search, but there was no valid consent given prior to the warrantless entry and search of the Coward residence. Defendant argues that the signing of such a post-search consent, done under great duress, did not validate the

2

illegality and involuntary nature of the search itself.

The government responds [Doc. 11] that the evidence was lawfully obtained in that officers requested and received both written and verbal consent to search from Defendant's wife prior to searching the home and that the search did not exceed the scope of her consent.[1]  The government states that the search revealed two .380 caliber pistols, a .22 caliber revolver, and approximately 10.8 grams of crack cocaine.  The two .380 caliber pistols and the crack cocaine were found on Defendant's person, who was found hiding  in an upstairs bedroom; the .22 caliber revolver was discovered on top of  a refrigerator, but Defendant claimed ownership of it in a Mirandized statement.  The government also notes that prior to finding Defendant and seizing the items that are now sought to be suppressed, the officers found and seized other drugs/drug paraphernalia and currency.  It further notes that the officers later discovered that Coward had outstanding warrants for his arrest.

## I. FACTS

The government's first witness was Peter Franzen ("Franzen").  Franzen testified that he has been an officer with the Knoxville Police Department ("KPD") for nine (9) years.  Franzen testified that around 12:00 noon on November 2, 2005, he and KPD officer Ron Linkins ("Linkins") went to 3923 Probus Drive, Apartment 176, in Knoxville, Tennessee, to investigate complaints of possible drug activity.  On that day, Franzen and Linkins were off duty and working for the Knoxville Community Development Corporation ("KCDC").  The subject apartment is located

---

[1]  The possible issue of Defendant's standing to contest the search of the apartment was addressed in the Motion [Doc. 10] and in the government's response [Doc. 11].  However, the government announced during the July 7, 2006 hearing that standing is not contested.

3

within the Christenberry Heights Housing Project, which is a KCDC managed property. Franzen testified that KCDC has received complaints of people hanging out on the porch and in the yard of the subject apartment, and also going in and out of the apartment in a manor which might suggest drug trafficking activity.

Franzen testified that it was his intent to do a "knock and talk" with the lessee of the apartment to investigate these complaints of possible drug activity. Franzen testified that he went to the front door of the apartment while Linkins went to the rear. Franzen knocked on the front door several times and eventually the front door was opened by Karen Denise Coward ("Mrs. Coward"). Franzen testified that this was the wife of Defendant. Franzen told Mrs. Coward that he was with KCDC and that he was there to investigate complaints of possible drug activity. Franzen testified that he asked Mrs. Coward if he could come in and speak with her. Franzen said that Mrs. Coward seemed to have been asleep prior to answering the door. According to Franzen, Mrs. Coward told him that he could come in and talk with her.

At that point, Franzen called Linkins on his radio and requested that he come and join him. Franzen then stepped inside the apartment. At that point, Mrs. Coward went upstairs to get a small child. Franzen watched her go up the stairs and get the child, a young boy, and then return to the downstairs area where she sat on a couch.

Franzen and Linkins then went inside the apartment and explained to Mrs. Coward about the complaints of possible drug activity and why they were there. According to Franzen, Mrs. Coward said that she did not have anything to do with people hanging out near her apartment. Franzen testified that he asked Mrs. Coward for permission to "look around" the apartment for narcotics. According to Franzen, Mrs. Coward said that was "all right" with her, "no problem."

4

Franzen then told Mrs. Coward that Linkins would go upstairs and start looking around while he stayed downstairs with her. Linkins then started to go up the stairs, and Mrs. Coward said that she needed to go with him to get something for a medical problem that she was having. Franzen testified that Linkins and Mrs. Coward then went up the stairs, and Linkins came down shortly thereafter with a small baggy of marijuana which he said was "in plain view." Linkins then went back upstairs to continue his search. The next thing Franzen heard was Linkins yelling that he had found a person, later identified as Derick Jones ("Jones"), hiding behind the bed in the master bedroom. Franzen heard Linkins yelling such things as "show me your hands."

Upon hearing this, Franzen went upstairs and helped secure Jones. Franzen testified that they found a large amount of cash and marijuana or crack tucked into the bed frame near where Jones had been hiding. Franzen testified that Jones was taken downstairs and placed in custody.

According to Franzen, Linkins then went back upstairs to continue his search. Franzen heard Linkins say that he could hear another person upstairs. Other officers were called. Franzen testified that an Officer Robertson arrived and went upstairs to join Linkins. Linkins and Officer Robertson then walked Coward downstairs. When Franzen saw Coward, Coward was wearing two holsters, and the officers were carrying two pistols. At that point, everyone was secured in the downstairs of the apartment.

Franzen testified that he then called the Organized Crime Unit, which included Investigator Todd Gilreath ("Gilreath"). Shortly thereafter, Gilreath arrived and he interviewed Mrs. Coward. Franzen heard Mrs. Coward's statements to Gilreath. Franzen testified that Mrs. Coward said the same things to Gilreath which she had said to Franzen. Franzen then observed Mrs. Coward give Gilreath a written consent for the search. According to Franzen, Mrs. Coward acknowledged

5

to Gilreath that she had earlier given oral consent to Franzen and Linkins to search the apartment.

Franzen testified that his microphone for the audio of his in-cruiser video camera was activated. The government played the tape in court, which Franzen acknowledged was scratchy and difficult to hear and understand. The audio tape ostensibly was of Franzen asking for and receiving consent to search from Mrs. Coward. Franzen testified, however, that while he could hear his request for consent to look around the apartment for narcotics, he could not clearly make out her giving consent to search because the quality of the recording was too garbled. The audio tape was marked as Exhibit 1 and received into evidence.

On cross examination, Franzen testified that he has conducted many "knock and talks." He described a knock and talk as asking questions and then usually asking for consent to search, especially if a narcotics complaint has been made.

Franzen testified that Mrs. Coward had told him that officers had been to her apartment before, and that she had talked to them about the people congregating around the outside of her apartment.

Franzen testified that when they first arrived at the apartment, Linkins went to the back of the apartment for officer safety and because sometimes persons attempt to flee from the rear of apartments when police are questioning at the front door. Franzen testified that after Mrs. Coward opened the door, he told her that he was Officer Franzen with KCDC. He testified that he asked her if he could step in and talk with her. Franzen testified that Mrs. Coward gave consent and said that he could come into the apartment and talk with her. Franzen testified that after he was inside the apartment for two to three (2-3) seconds, he radioed Linkins to come around to the front

door. According to Franzen, Mrs. Coward said that people did hang around her apartment but that she wasn't involved with them. Franzen testified that he then asked if they could "look around for narcotics," and Mrs. Coward said that they could. Franzen testified that Linkins then went upstairs and found marijuana in plain view, and then the more extensive search followed. Franzen testified that he thought that he and Linkins had consent to look in closed containers, but that because the marijuana was found in plain view, the issue did not arise.

Franzen testified that Mrs. Coward told him that she had a cyst under her arm that was bleeding, so she wanted to go up stairs and get a heating pad.

Franzen testified that he did not believe that it was necessary to attempt to get a search warrant, because Mrs. Coward gave consent and never withdrew her consent, along with the fact that marijuana was found in plain view. Franzen testified that at the beginning of his conversation with Mrs. Coward, he might have asked whether anyone else was at home. Franzen testified that it may have been at that point that Mrs. Coward went upstairs to retrieve the young boy and bring him downstairs. Franzen again testified that Linkins came down the stairs with a small tin, with a baggy of marijuana inside of it. A total of two baggies of marijuana were found. The second baggy was found near where Jones had been hiding behind the bed. Franzen testified that a baggy of crack cocaine also was found near where Jones was hiding behind the bed.

Franzen testified that after more officers arrived on the scene, he searched the kitchen area and the downstairs only. Franzen testified that he did not arrest Coward, handcuff him or search him. Franzen testified that the Organized Crime Unit arrived about ten to fifteen (10-15) minutes after Coward was found hiding under the bed in the upstairs bedroom. Franzen testified that he personally never saw any evidence in plain view. Franzen testified that the total time in which

7

officers were in the apartment was approximately two to three (2-3) hours. He testified that Mrs. Coward stayed in the apartment the entire time. Franzen testified that the search of the apartment went on for some time before Mrs. Coward signed a consent form for Gilreath.

On redirect examination, Franzen testified that when Coward was brought downstairs by Linkins, Coward said to Mrs. Coward, "Why did you let them in the apartment?" According to Franzen, Mrs. Coward responded "I didn't think you were here." Franzen testified that Coward was arrested that day on outstanding arrest warrants. Coward was later indicted on the drug charges in this case.

Mrs. Coward was confined once the marijuana was found, because an investigation was occurring. According to Franzen, the officers were trying to determine if she was involved in drug trafficking.

On re-cross examination, Franzen testified that he did not know Coward had an outstanding arrest warrant, or even that Coward would be at the apartment, when the officers arrived there to do the knock and talk. Franzen acknowledged that when the marijuana was found in the apartment, he may have told Mrs. Coward something to the effect of "you are in trouble."

The government's next witness was Todd Gilreath ("Gilreath"), a KPD officer since January, 1993. Gilreath testified that presently, and also on November 2, 2005, he is assigned to the Organized Crime Unit and to the FBI Violent Crime Task Force. Gilreath explained that this is a cross designation. Gilreath testified that he arrived at Mrs. Coward's apartment at approximately 12:35 p.m. on November 2, 2005. On arrival, Coward and Jones already were in custody. Gilreath testified that he knew Jones from past police matters. In total, Gilreath testified there were four to five (4-5) officers on the scene. He said that Mrs. Coward was in the living room talking with

8

Franzen.  Gilreath testified that he then talked with Mrs. Coward.  He said that he read the consent to search form to her and, she said that she understood it, and she signed it.  Mrs. Coward told Gilreath that she had leased the apartment since November 1998 and that she lived there with her three (3) children.

Gilreath testified that Mrs. Coward said that Coward never lived at the apartment, and that he should not have a key to the apartment.  According to Gilreath, Mrs. Coward said that Coward lived with his father in the area of Old Rutledge Pike.  However, Coward had been staying with her children at night so that she could care for her mother, who was ill.  Still, Mrs. Coward said to Gilreath that Coward was not free to come and go from the apartment as he pleased.  Gilreath testified that he told Mrs. Coward that he was assigned to the FBI, but that the KPD officers were doing the search of her apartment.  A copy of the FBI consent form signed by Mrs. Coward was marked as Exhibit 2 and received into evidence. Gilreath testified that after Mrs. Coward signed the consent form, he personally did not search the apartment.  However, he did look around some.  The KPD officers did continue their search after Mrs. Coward signed the form.

According to Gilreath, Mrs. Coward told him that on the day in question, she had gotten up earlier to take her two older children to school.  She said that Coward and Jones brought some food by, but then she fell asleep on the couch with her youngest child.  The next thing she recalls was the knocking on the door.  According to Gilreath, she did not see Coward or Jones when she woke up, so she answered the door.  She said that she thought that Jones and Coward had left.  Gilreath testified that Mrs. Coward denied ever seeing the guns, crack cocaine, drug paraphernalia, and other evidence found prior to the consent form being signed.  According to Gilreath, she said that Jones, Coward, or someone else must have put these items in her apartment.

On cross examination, Gilreath testified that Coward was in custody when he arrived. Drawers and other areas of the apartment had already been searched when he arrived as well. As a result, Gilreath spent most of his time talking with Mrs. Coward and getting her side of the story. Gilreath testified that Mrs. Coward obviously was tired, and she also appeared to be upset over the illness of her mother, along with the fact that someone would bring drugs and guns into her apartment.

Gilreath testified that there were three (3) other officers in his car, because they had been at another drug related operation when he received the call to come to Mrs. Coward's apartment. Gilreath testified that he does not know the exact number of officers on the scene, but there were at least two (2) other squad cars on the scene.

Gilreath testified that he was not present when Coward was interviewed later at the police station.

Gilreath testified that the time was not noted on the consent form when it was signed by Mrs. Coward. Gilreath testified that while it is possible that a pistol was found in the kitchen after Mrs. Coward signed the consent form, it was his belief that all other items of evidence were found prior to her signing the consent form.

The government's next witness was Ronald Linkins ("Linkins"), a KPD officer. Linkins testified that on November 2, 2005, he was off duty and working for KCDC on housing patrol detail. Linkins testified that Mrs. Coward told him that she was the lessee of the apartment. Linkins testified that they told her that they were there on a narcotics search, and that Mrs. Coward gave consent to search the apartment. According to Linkins, Mrs. Coward then said that she needed to go upstairs and get a heating pad. She did go upstairs, along with Linkins, and she got a heating

pad in a bedroom. Linkins testified that while in bedroom, he saw a tin box on the dresser. Linkins testified that he opened the tin box and looked inside and saw marijuana. He said that he does not remember having any conversation with Mrs. Coward about finding the marijuana.

Linkins testified that he then went downstairs and detained Mrs. Coward, and he went back upstairs to continue his search. He testified that he went back to the bedroom and found Jones hiding next to the bed. Linkins testified that he then took Jones downstairs and Franzen detained Jones. Linkins testified that he then went back upstairs and found marijuana in the bed frame next to where he had found Jones. Linkins then took that marijuana downstairs. Linkins then returned again to the bedroom and found some crack cocaine in a cardboard box with drawers. The cocaine was inside one of the drawers. Linkins testified that he secured that crack cocaine downstairs and then returned to the master bedroom. Linkins testified that as he was moving a chest from the end of the bed, he saw feet underneath the bed. He immediately determined that he would need assistance in securing this person under the bed, since Franzen was already securing Jones and Mrs. Coward downstairs, so he called for another officer to come and help him.

When another officer arrived, he and the other officer removed Coward from beneath the bed and put him into custody. Linkins testified that Coward had two (2) pistols and crack cocaine on his person. Linkins testified that Coward eventually was placed under arrest for outstanding arrest warrants for failure to appear. Linkins testified that another officer found a .22 caliber pistol in the kitchen. Linkins testified that this firearm was found after Gilreath had arrived on the scene.

Linkins testified that Mrs. Coward never withdrew her consent to search. He testified that she also never limited the consent to search for narcotics which she had given.

11

On cross examination, Linkins testified that he had gone to Mrs. Coward's apartment to investigate complaints of possible drug activity on her porch and in and around her apartment. He testified that he was there to do a knock and talk. He testified that he went to the rear of the apartment while Franzen went to the front door. Linkins explained that Mrs. Coward lived in the corner apartment. He testified that Franzen called him around to the front after Mrs. Coward answered the door. Linkins, however, did not hear the initial exchange of words between Mrs. Coward and Franzen. He testified that when he arrived at the front door, Franzen was holding the screen door open for him at the threshold so that they could go inside. Mrs. Coward was inside. Linkins testified he then went into the apartment with Franzen. He testified that there was a young child running around downstairs. He did not see Mrs. Coward go upstairs to get the child. However, Linkins testified that after he had been in the apartment for three to four (3-4) minutes, that Mrs. Coward did go upstairs to get a heating pad.

Linkins testified that photographs were taken that day of the items seized. Exhibit 3 was marked and received into evidence. Linkins testified that it is a photograph of the tin box which he saw in the bedroom, opened and found marijuana inside. He testified that he took the tin box, the contents thereof, and Mrs. Coward back downstairs to Franzen. Linkins said that Franzen took custody of Mrs. Coward.

Linkins testified that he did hear Mrs. Coward give consent to search. According to Linkins, Franzen asked her if she would mind if they looked around the apartment for narcotics. According to Linkins, Mrs. Coward said okay. Linkins testified that this occurred before he went upstairs. Linkins also testified that after he saw the feet of someone hiding under the bed, two (2) more officers responded. By the end, approximately eight (8) officers were on the scene. Linkins

testified that there were two (2) hours total time of officers in the apartment.

Defendant's witness was Karen Denise Coward ("Mrs. Coward"). Mrs. Coward testified that she goes by Denise. She testified that she has been the wife of Defendant since 1997. She said that the couple has three (3) children, ages 2, 7, and 8. Mrs. Coward testified that on November 2, 2005, she was the lessee of the apartment at 3923 Probus Drive, Apartment 176. She testified that the lease was in her name only and that she and her three (3) children were on the lease. She said that was the case since 1998, when she first moved in. She testified that Coward started living in the apartment with her in June or July of 2005 and that the apartment was his primary residence from then until November, 2005. Mrs. Coward stated that she and Defendant were "separated on/off" because Defendant had a bad drug habit, of which she disapproves, and she did not want drug activity around her children.

Mrs. Coward testified that earlier that day, she had sent her older children to school. She said that Coward and Jones were there, but she thought they had left. She was asleep on the couch when the KPD knocked on the front door. She testified that she thinks that there were two (2), uniformed officers at the door. Her recollection is that the officers said that they were there to do a "knock and talk" about young boys on her porch and yard, just hanging out a lot. Mrs. Coward testified that she told the officers that she would talk with them about the situation. She testified that she told the officers that she herself had complained about these people hanging out around her apartment and making it difficult for her children to sleep at night.

Mrs. Coward then listened to the audio of the KPD tape, Exhibit 1. She testified that she recognized her voice on the tape. She testified that she could not understand what she was saying on the tape. She testified that she thinks that maybe the screen door was already opened by

13

the officers when she answered the door.

Mrs. Coward testified that she does not remember if the KPD officers asked if they could come inside. She testified that she went upstairs to get her son and one of the officers followed her up the stairs and was standing in the upstairs bedroom when she noticed him. She testified that no officer had asked for permission to search or to do anything else. She testified that the officer who had followed her upstairs asked her to go downstairs. According to Mrs. Coward, the officer then found Jones and brought him downstairs. She testified that the officer then went back upstairs to continue searching.

Mrs. Coward testified that she did not know Jones and Coward were in the apartment. She testified that she thinks that the officer found Jones first, but she is not sure whether the officer found Jones first or the marijuana in the tin container first. According to Mrs. Coward, all she remembers is an officer saying something to the effect of "you got problems." She testified that Jones was handcuffed and placed on the couch in the living room, and she sat on the chair in the living room. She testified that she did not think that she had the right to ask the officers to leave her apartment once they were inside.

Mrs. Coward testified that she did go back upstairs to get something, maybe a wash cloth or heating pad, to treat a spider bite. However, she testified that this was after the officer found Jones and brought him downstairs.

Mrs. Coward testified that she was scared because she was afraid for her children. She said that she thought she might be arrested, and she was nervous. She called a friend to come over and sit with her and be there to watch her kids if necessary, should she be taken into custody.

14

Mrs. Coward testified that she remembers Gilreath arriving at the scene. However, she said that she does not remember her conversation with Gilreath. She testified that she was shown the evidence, specifically marijuana, guns, crack cocaine, in a bag. However, she testified that she does not remember what document or documents she signed. She testified that "I just signed forms; I put my name on papers they put in front of me." She testified that Gilreath talked to her while she signed papers.

Mrs. Coward testified that she does not recall ever giving consent to anyone to search. She also stated that she could have forgotten that she gave consent to search. According to her testimony, the officers were just going to talk with her, and she was willing to talk with them. She testified that after the officers left, she found every drawer in her bedroom had been dumped on the floor and the mattress was off the bed.

On cross examination, Mrs. Coward listened again to the audiotape, Exhibit 1. She testified that she can hear on the tape the officer asking, "Can we look around for narcotics?" However, she testified that while she can hear her voice on the tape, she can not make out what she said and she does not remember what she said in response to the officer's question. She did testify that the officer was still outside of her apartment when that question was asked. She testified that at that point, she went upstairs to get her son.

Mrs. Coward testified that whether or not she ever gave consent, she does agree that she never withdrew consent. She also testified that she saw more than one paper, and that she does not remember if she signed more than one form that day. Mrs. Coward looked at Exhibit 2, the consent to search form, but testified that she does not remember seeing the form. However, she testified that her signature was on the form.

15

On re-direct examination, Mrs. Coward testified that she turned away from the conversation with the officers, who were still outside of her apartment, because her son went upstairs and she went after him. She testified that she told them to wait until she was able to get her child. Finally, she testified that it was possible that she did not even respond to the request by the officer to look around the apartment for narcotics.

### III. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Defendant contends that his Fourth Amendment rights were violated when officers conducted a warrantless search of the apartment leased by his wife on November 2, 2005, and that any evidence gained as a result of that search must be suppressed. He also maintains that any statement he gave following the search should also be suppressed as the fruit of the illegal search. The Court will examine each of these contentions in turn.

### Warrantless Search on November 2, 2005

Where valid consent is given, a search is permissible under the Fourth Amendment even without a warrant or probable cause. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Such consent must be "freely and voluntarily given" and officers must conduct the search within the scope of the authorization given. Id. at 222; United States v. Soto, 124 Fed.Appx. 956, 964 (6th Cir. 2005).

Defendant contends that Mrs. Coward did not give the officers consent to search her residence on November 2, 2005. He argues that the officers told Mrs. Coward that they were

there to conduct a "knock and talk," and that she agreed only to talk with them. He asserts that she never consented to a search of the apartment. Defendant nonetheless argues that in the event the Court finds that Mrs. Coward did permit the officers to come in and "look around," this does not mean to go upstairs to the bedroom and look in closed containers and drawers. He further argues that the written consent form was signed too late, after all the evidence was already seized, and what's more, it is a FBI form. Finally, Defendant claims that Mrs. Coward was under great duress and therefore could not give a valid consent.

The government responds that Mrs. Coward voluntarily and validly consented to the officers searching the apartment for narcotics, which led to their discovery of Defendant, firearms and crack cocaine. The government argues that the marijuana discovery is irrelevant because Defendant was not charged for it, but charged only for the drugs and guns found on his person. The government argues that there was no duress or coercion of Mrs. Coward at any time.

*1. Whether Mrs. Coward gave the officers consent to enter and search the apartment:*

Officers Franzen and Linkins testified that they arrived at 3923 Probus Drive, Apartment 176, for the purpose of conducting a "knock and talk[2]" with the lessee of the apartment [Mrs. Coward] to investigate complaints of possible drug activity. Franzen and Linkins testified that they informed Mrs. Coward why they were there and that she permitted them to enter her apartment and gave them verbal consent to "look around the apartment for narcotics." Franzen further testified

---

[2] "Court have defined [knock and talk] as 'a noncustodial procedure [in which] the officer identifies himself and asks to talk to the home occupant and then eventually requests permission to search the residence.'" United States v. Chambers, 395 F.3d 563, 568 n.2 (6th Cir. 2005) (quoting United States v. Hardeman, 36 F.Supp.2d 770, 777 (E.D.Mich. 1999). Officer Franzen likewise defined a "knock and talk" as such in this case. Courts generally have upheld this investigative procedure as a legitimate effort to obtain a suspect's consent to search. Chambers, 395 F.3d at 568 n.2.

that he was present when Gilreath later interviewed Mrs. Coward, and stated that when she signed the written consent form, she also acknowledged to Gilreath that she had earlier given Officers Franzen and Linkins oral consent to search the apartment. Officers Franzen and Linkins testified that Mrs. Coward never withdrew her initial, oral consent, which was likewise corroborated by Mrs. Coward. Franzen specifically characterized the consent exchange in this way:

> Permission to Enter Residence: Around 12:00 noon on November 2, 2005, he and Officer Linkins knocked on Apartment 176, located within the Christenberry Heights Housing Project. Mrs. Coward opened the door.

> Frazen informed Mrs. Coward that he was with the KCDC and that he was there to investigate complaints of possible drug activity. He asked if he could step in and talk with her. Mrs. Coward told him he could. Officers Franzen and Linkins entered the apartment.

> Consent to Search: Mrs. Coward informed the officers that people did hang around her apartment but that she was not involved with them. Officer Franzen then asked Mrs. Coward if they could "look around for narcotics." Mrs. Coward said it was "all right" with her, "no problem."

At the hearing, Mrs. Coward agreed that two, uniformed police officers knocked on her door on the day in question. She stated that she remembered telling the officers that she would talk to them, but did not remember telling them that they could enter her apartment. Mrs. Coward also stated that she did not remember giving the officers verbal consent to search her apartment, but indicated that "she could have forgotten." Mrs. Coward further testified that while she remembered signing forms after Investigator Gilreath arrived, she could not remember what she signed, nor could she remember the conversation she had with Gilreath. The government then played a segment of the audiotape for Mrs. Coward from that day. The Court could clearly hear an officer [Officer Franzen] ask, "Would it be okay if we come in and look around for narcotics?" While it is unclear

18

from the tape how Mrs. Coward responded to this question, when specifically asked how she responded, she testified that she could not remember what she had said to Officer Franzen. She did, however, agree that once the officers began to search the apartment, she never told them that they could not search.

After carefully weighing the testimony of the witnesses, the Court finds Officer Franzen's testimony to be more credible than Mrs. Coward's testimony. In support of this finding, the Court would initially note that both witnesses were testifying to events which occurred in November, 2005 - approximately eight months ago. While Officer Franzen gave detailed factual recollections of the events and conversations that transpired that day, which were essentially consistent with the other officers' testimony and, in part, corroborated by the audiotape, Mrs. Coward appeared to have forgotten or did not remember key portions of the conversations she had with the officers. The Court finds that Mrs. Coward's lack of specific recall, in conjunction with her testimony that she "could have forgotten" that she gave the officers consent to search, does not raise her testimony to the level of the testimony given by Franzen and Linkins. Additionally, while Mrs. Coward told the officers that Defendant did not live at the apartment on November 2, 2005, she testified at the hearing that the apartment was Defendant's primary residence from June, 2005 thru November, 2005. Finally, Franzen testified that when Defendant was placed in custody and escorted past Mrs. Coward, Defendant stated, "Why did you let them in the apartment?" Mrs. Coward responded, "I didn't think you were here." This is not, in the Court's estimation, a response someone would make unless they had, in fact, permitted someone to enter the residence. In conclusion, the Court does not find Mrs. Coward's testimony to be reliable and, thus, credits the officers' testimony concerning whether Mrs. Coward validly permitted the officers to enter the

residence and conduct a search for narcotics.

Based on the foregoing, the Court finds that Mrs. Coward (1) did permit the officers to enter the residence, and (2) in response to Officer Franzen's request to "look around [her apartment] for narcotics," she said, "all right, no problem." Accordingly, Mrs. Coward's verbal consent to search the apartment validated the officers' warrantless search, as long as consent was voluntary and the officers conducted the search within the scope of the authorization given by Mrs. Coward.

For the sake of completeness, the Court would also note that sometime after Investigator Gilreath arrived on the scene, Mrs. Coward signed a FBI consent form [Ex. 2]. While the form does not note the time in which she signed the form, Gilreath testified that Defendant was already in custody and most (if not all) of the search had already been conducted by the time the form was signed. Because the Court has already found that Mrs. Coward gave the officers verbal consent to search, which is a standard law enforcement investigatory technique[3], and because the consent form appears to have been signed some time after the majority of the search had already been conducted, the Court will primarily focus its analysis on the verbal consent that was given. Nonetheless, the Court finds that the officers' testimony regarding the events of that day is further corroborated by the fact that Mrs. Coward signed the written consent form.

2. *Scope of Consent To Search*:

"When law enforcement officers rely upon consent as the basis for a warrantless search, the scope of the consent given determines the permissible scope of the search." <u>United

---

[3] <u>See</u> <u>Schneckloth</u>, 412 U.S. at 231-32.

States v. Henry, 429 F.3d 603, 616 (6th Cir. 2005) (quoting United States v. Garrido-Santana, 360 F.3d 565, 575 (6th Cir.) *cert. denied*, 542 U.S. 945 (2004)). "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness - what would the typical reasonable person have understood by the exchange between the officer and the suspect?" Henry, 429 F.3d at 616 (quoting Florida v. Jimeno, 500 U.S. 248, 251 (1991)). "The scope of the search is generally defined by its expressed object." Id. "A suspect may of course delimit as he chooses the scope of the search to which he consents. But if his consent would reasonably be understood to extend to a particular container, the Fourth Amendment provides no grounds for requiring a more explicit authorization." United States v. Hill, 79 Fed.Appx. 869, 874 (6th Cir. 2003).

   In this case, Defendant contends that the search of the insides of dressers, closets and closed containers exceeded the scope of Mrs. Coward's consent. The Court does not agree. Mrs. Coward granted Officers Franzen and Linkins permission to "look around the apartment for narcotics," and did not place any explicit limitation on the scope of the search. Officer Franzen informed Mrs. Coward that he was there to investigate complaints of possible drug activity, and specifically requested consent to search the apartment for narcotics. Accordingly, the Court finds that it was objectively reasonable for the officers to conclude that the general consent to search Mrs. Coward's apartment included consent to search areas where narcotics could be located. In fact, the Sixth Circuit has stated that "it is particularly important to allow searches of closed containers in cases where the suspect is told that officers are searching for drugs, since drugs are often stored in...containers." United States v. Grant, 112 F.3d 239, 240 (6th Cir. 1997).

   Additionally, Officer Franzen's request to "look around the apartment" did not limit

the scope of the search to a visual inspection. <u>Grant</u>, 112 F.3d at 240. The Sixth Circuit has explicitly stated that "it is not necessary for an officer specifically to use the term 'search' when he requests consent....any words, when viewed in context, that objectively communicate to a reasonable individual that the officer is requesting permission to [conduct a search] constitute a valid search request for Fourth Amendment purposes." <u>Id.</u> (quoting <u>United States v. Rich</u>, 992 F.2d 502 (6th Cir. 1993).

Based on the foregoing, the Court finds that the officers did not exceed the scope of Mrs. Coward's verbal consent when they searched the insides of dressers and closed containers. Even so, the Court would note that Defendant is only charged for the drugs and two guns found on his person, in addition to the gun discovered on top of the refrigerator, which Defendant apparently claimed ownership of in a <u>Mirandized</u> statement.[4] In other words, Defendant is not being charged with the marijuana, marijuana pipe, electric scales, baggy of crack cocaine and approximately $2000 in U.S. currency that was also found and seized from Mrs. Coward's apartment.


*3. Whether Mrs. Coward's Verbal Consent was Voluntary:*

The remaining issue is whether the consent given by Mrs. Coward was voluntary. An officer may conduct a warrantless search when the person with a privacy interest in the item to be searched gives a free and voluntary consent. <u>Schneckloth</u>, 412 U.S. at 219-22. When the validity of a warrantless search is based on consent, however, the government has the "burden of proving, by a preponderance of the evidence, through 'clear and positive testimony,' that consent was "freely

---

[4] The Court notes that defense counsel made no specific argument with regard to government's contention that Defendant claimed ownership of the gun discovered on top of the refrigerator in a <u>Mirandized</u> statement, other than making a general argument that any statement which Defendant gave following the search should be suppressed as the "fruit of the illegal search."

and voluntarily given," and was not the result of coercion, duress, or submission to a claim of authority. United Stats v. Worley, 193 F.3d 380, 386 (6th Cir. 1999); United States v. Riascos-Suarez, 73 F.3d 616, 625 (6th Cir. 1996). Whether a defendant's consent was voluntary is a question of fact to be determined from the totality of the circumstances. United States v. Jones, 846 F.2d 358, 360 (6th Cir. 1988). Relevant factors include Defendant's age, intelligence, and education; whether she understands her constitutional rights; the length and nature of the detention; and the use of coercive or punishing conduct by the police. United States v. Valdez, 147 Fed.Appx. 591, 596 (6th Cir. 2005). The Fourth Amendment requires only that the police reasonably believe the search to be consensual. Id. (citing Illinois v. Rodriguez, 497 U.S. 177, 185-86 (1990)).

Viewing the totality of the circumstances in this case, the Court finds that Mrs. Coward's verbal consent was voluntary for the following reasons: Mrs. Coward is not a minor; she is married with three children. She indicated that she and Defendant had been a "couple" for nineteen years and had been married for nine years. While she appears to have no real criminal history herself, the Court would note that her husband, whom she has been involved with for the past nineteen years, is a convicted felon with, according to Mrs. Coward, a "bad drug habit." In fact, Mrs. Coward testified that Defendant's name was not placed on the lease because of his conviction status. Thus, while Mrs. Coward may not be as familiar with the criminal justice system as Defendant, the Court does not believe she is completely unaware either. Furthermore, the Court observed Mrs. Coward to be intelligent; she appeared to have no troubling communicating and/or understanding the questions asked of her at the hearing.

The Court notes that there is no evidence before it which would indicate that Mrs. Coward was advised of her constitutional rights prior to her giving the officers verbal consent to

search her apartment. While knowledge of the right to refuse consent is one of the many factors to consider in determining the voluntariness of the consent, the police are under no legal obligation to inform someone of the right to refuse consent because, "[i]t would be thoroughly impractical to impose on the normal consent search the detailed requirements of an effective warning." Schneckloth, 412 U.S. at 231. Although Officers Franzen and Linkins did not inform Mrs. Coward of her right to refuse consent to the search, the Court finds that she was neither commanded or required to consent to the search. Instead, the Court finds that the officers asked Mrs. Coward if they could look around the apartment for narcotics; she said it was "all right" with her, "no problem." "Police officers act in full accord with the law when they ask citizens for consent. It reinforces the rule of law for the citizen to advise the police of his or her wishes and for the police to act in reliance on that understanding. When this exchange takes place, it dispels inferences of coercion." United States v. Drayton, 536 U.S. 194, 206 (2002).

Contrary to Defendant's claim that Mrs. Coward's consent was involuntary because she was under duress when she consented to the search, the Court finds no evidence of overt duress or coercion. Based on the evidence advanced at the hearing, only two officers [Franzen and Linkins] were present when verbal consent was requested and given. Neither officer brandished their firearm, and although the encounter did not occur in a public place, the record, including the audio/videotape, indicates that the parties spoke in conversational tones. Mrs. Coward was not restrained or subjected to any type of lengthy interrogation. Further, there is no evidence that the officers attempted to threaten, intimidate or trick Mrs. Coward into consenting to the search. Accordingly, the Court finds, under the totality of the circumstances, that the government has proven, by a preponderance of the evidence, that Mrs.Coward's verbal consent to search the residence for narcotics was, in fact,

voluntary and, therefore, was not the product of duress or coercion, either express or implied.

Lastly, the Court finds that Mrs. Coward's response to Officer Franzen's request to search her apartment was specific, unequivocal, and intelligently given. When Mrs. Coward answered the officers' knock at her door, Officer Franzen explained why they were there and asked her if they could come in and look around the apartment for narcotics. In response, Mrs. Coward said, "all right, no problem," and further indicated to the officers that she did not have anything to do with people hanging out near her apartment. The Court finds that a reasonable police officer would have believed that Mrs. Coward's response indicated that she clearly and unequivocally consented to the searches. Thus, the Court finds that consent was given "freely and voluntarily," and was not "merely a response conveying an expression of futility in resistence to authority or acquiescing in the officer's request." See United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999).

Accordingly, the Court finds that the government has met its burden, by a preponderance of the evidence, and shown, through clear and positive testimony, that valid consent to search was obtained. Thus, based on Mrs. Coward's voluntary consent to search, the officers had authority to search Defendant's home. As a result, the Court finds that any statement which Defendant gave following the search[5] should not be suppressed as the "fruit of the illegal search."

---

[5] The Court would note that Officer Franzen testified that when Defendant was placed in custody and brought downstairs by Officer Linkins, Defendant stated to Mrs. Coward, "Why did you let them in the apartment?" This was the only "statement made by Defendant" advanced at the hearing. Further, defense counsel made no specific argument with regard to the foregoing statement, other than making a general assertion that any statement which Defendant gave following the search should be suppressed as the "fruit of the illegal search."

## III. CONCLUSION

For the reasons set forth herein, it is **RECOMMENDED** that Defendant Danny Ray Coward's Motion to Suppress Evidence [**Doc. 10**] be **DENIED**.[6]

Respectfully submitted,

_____s/ H. Bruce Guyton_____
United States Magistrate Judge

---

[6]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).